**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0686n.06
Filed: September 21, 2007

Nos. 06-2591, 06-2628, 07-1344, 07-1503, 07-1608, 07-1609

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| EVERETT HADIX, et al., | ) | |
| | ) | |
| Plaintiffs-Appellees, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| PATRICIA L. CARUSO, et al., | ) | WESTERN DISTRICT OF MICHIGAN |
| | ) | |
| Defendants-Appellants. | ) | |

Before: SUTTON and McKEAGUE, Circuit Judges; and FORESTER, District Judge.[*]

PER CURIAM. In this consolidated appeal, the State of Michigan challenges six district court orders arising from a consent decree that governs the conditions of confinement at several Michigan prison facilities. Because a recent opinion by the district court may moot some of these appeals, because the State has agreed to comply with some of the orders underlying these appeals and because both the State's planned closing of one prison and the district court's recent decision narrow the scope of these disputes, we remand the orders to the district court to determine which ones, if any, have become moot and to determine the scope of the dispute underlying the remaining orders.

---

[*] The Honorable Karl S. Forester, Senior United States District Judge for the Eastern District of Kentucky, sitting by designation.

I.

The six appeals share a common history: They all arise from a lawsuit filed by several prisoners in 1980 about their conditions of confinement and the consent decree approved by the district court in 1985 that arose from this litigation. The original consent decree governed various aspects of prison conditions, including in-cell temperatures, medical care and mental health care, in what have become known as the *Hadix* Michigan prison facilities. Since its initial approval of the consent decree, the district court has modified or terminated several of its provisions. Of particular relevance here, after the passage of the Prison Litigation Reform Act of 1995 (PLRA) and after the conclusion of litigation challenging the constitutionality of that legislation, the district court in 2001 granted the State's motion to terminate the mental health care portion of the decree, finding no "current and ongoing" constitutional violations. *See* 18 U.S.C. § 3626(b)(2)–(3).

Today's round of litigation stems primarily from two developments: (1) the death of a *Hadix* inmate in August 2006 (which, according to the plaintiffs, exposes ongoing deficiencies in the *Hadix* facilities) and (2) the State's recent decision to close certain *Hadix* facilities and transfer the affected inmates to other non-*Hadix* facilities as part of a cost-savings plan. In the aftermath of these events and in response to several motions filed by the plaintiffs, the district court issued a series of orders.

*First*, on November 13, 2006, the district court granted the plaintiffs' motion under Federal Rule of Civil Procedure 60(b)(6) to reopen the mental health care portion of the consent decree, enjoined the State from using certain types of restraints within the *Hadix* facilities and ordered the

State to take several actions related to mental health care. *Hadix v. Caruso*, 461 F. Supp. 2d 574, 599–600 (W.D. Mich. 2006).

*Second*, on December 7, 2006, the district court ordered the State to establish the Office of Independent Medical Monitor to oversee prisoner health care at the *Hadix* facilities and to take corrective actions where necessary. *See Hadix v. Caruso*, 465 F. Supp. 2d 776, 810–11 (W.D. Mich. 2006).

*Third*, on March 6, 2007, after the State's announcement of its intention to close one of the *Hadix* facilities (JMF) and transfer the affected inmates to non-*Hadix* facilities, the district court granted the plaintiffs' motion for a preliminary injunction to prevent the transfer of JMF inmates until the State submitted, and the court approved, a formal transfer plan. *See Hadix v. Caruso*, No. 4:92-CV-110, 2007 WL 710136, at *2, 9 (W.D. Mich. Mar. 6, 2007).

*Fourth*, on April 3, 2007, the district court granted the plaintiffs a permanent injunction requiring the State to house "all prisoners classified at high-risk for heat-related injury . . . in areas in which the heat index is reliably maintained below a heat index of 90." *Hadix v. Caruso*, 492 F. Supp. 2d 743, 753 (W.D. Mich. 2007).

*Fifth*, on May 4, 2007, the district court rejected the State's transfer plans, submitted in response to the March 6 order, finding several deficiencies in the plans. *See Hadix v. Caruso*, No. 4:92-CV-110, 2007 WL 1341958, at *1–2 (W.D. Mich. May 4, 2007).

*Sixth*, on May 14, 2007, following the State's decision to close 8-Block, a unit that is part of a *Hadix* facility, and transfer the affected inmates to prison facility Buildings A and B, units not explicitly covered by the original consent decree, the district court terminated its jurisdiction over 8-Block but began exercising jurisdiction over Buildings A and B based on its conclusion that those buildings are "*de facto Hadix* facilities." *Hadix v. Caruso*, No. 4:92-CV-110, 2007 WL 1434795, at *1–2 (W.D. Mich. May 14, 2007). The State appealed this order with respect only to Building A.

After the district court rejected its transfer plans on May 4, the State sought a stay pending appeal of that order and the related March 6 order. On June 22, this court stayed those orders "to the extent that they enjoin or prevent the transfer of the non-special needs prisoners from [JMF]" and denied them "with respect to the special needs prisoners." *Hadix v. Caruso*, Order, Nos. 07-1344/1608, at 3–4 (6th Cir. June 22, 2007). As to the State's plan to transfer special needs prisoners, the court directed the district court to reconsider the validity of that plan and to "address[] the following issues: 1) whether transfer evaluations are to be undertaken on an inmate-by-inmate basis or on a facility-by-facility basis; 2) which party—the State or the plaintiffs—bears the burden of proof with respect to the medical care available at the non-Hadix facilities and the suitability of that care for each inmate; and 3) why does the State's transfer plan fall short of complying with the transfer requirements of the consent decree." *Id.* at 3. The court also expedited the briefing of these six appeals in light of the budgetary concerns underlying the State's efforts to close some of these facilities.

On September 8, less than one week before oral argument of these appeals (but consistent with our earlier order), the district court issued a decision directly affecting three of the cases on appeal and indirectly affecting the other three. The court held that SMT Building B is not a *Hadix* facility because it was not within the scope of the consent decree. *Hadix v. Caruso*, Opinion, No. 4:92-CV-110, at 5–7 (W.D. Mich. Sept. 8, 2007). The court accordingly terminated all injunctive relief relating to Building B. *Id.* at 8.

The court also answered our June 22 questions. It held that transfer evaluations must be undertaken on an inmate-by-inmate basis. *Id.* at 9. It held that the plaintiffs bear the burden of proof in connection with transfer evaluations. *Id.* at 10. And it held that the State's "August transfer plan . . . complies fully with the transfer requirements of the Consent Decree." *Id.* at 14. Recognizing that an appeal concerning an earlier transfer plan was pending before this court, the district court approved the State's August transfer plan but "stay[ed] the effectiveness of its approval until [this court] issues its mandate in the pending appeal." *Id.* at 15. The court also granted one of the plaintiffs' motions for contempt sanctions (relating to electronic medical records and pharmacy services) and denied the other (relating to mental health care). *Id*. at 18, 20.

II.

A.

At oral argument and in briefs filed with us shortly before the argument, the State argued that, in view of the district court's September 8 decision approving the August transfer plan, its transfer-related appeals (from the March 6 and May 4 orders) are moot. The State also argued that another appeal relating to SMT Building A (from the May 14 order) is moot because the reasoning underlying the district court's September 8 decision concerning Building B applies equally to Building A. Rather than resolving these mootness claims without full briefing and argument by the parties, we think that the more prudent course is to allow the district court to assess these arguments in the first instance. We thus remand these three cases to the district court with instructions to address the State's arguments.

B.

That leaves the question of what we should do with the three remaining appeals: remand them to the district court for further consideration in light of these and other recent developments or decide them now? At oral argument, the State responded to this question by suggesting that we should remand the three remaining orders to the district court. As the State is the appellant in all six appeals (and thus could dismiss the appeals unilaterally if it wished), that view is not without some force. Adding force to that view is the following: considerable overlap exists between all six cases; the State has agreed to comply with several of the orders in recent months; the imminent closing of

one of the *Hadix* facilities will likely narrow the scope of the parties' disagreements; and the district

court's recent orders may affect the disputes underlying the three remaining appeals. Rather than

attempting to address this moving target and rather than issuing rulings that time may make

irrelevant, we believe that the better course, as we explain in more detail below, is to permit the

parties and the district court to address these issues in the first instance.

1.

Recent events affect the State's appeal of the district court's November 13 decision reopening

the mental health portion of the consent decree. If the State closes JMF, as it plans to do in the near

future and as the district court has authorized, and if the district court rules that SMT Building A is

no longer subject to the consent decree, the prisoner population of the *Hadix* facilities would change

dramatically—and so would the number of *Hadix* prisoners needing mental health services. *See*

*Hadix*, 461 F. Supp. 2d at 584 (indicating that "JMF currently [*i.e.*, as of November 2006] houses

1,452 prisoners" and that "[a]ll but 219 of those prisoners are assigned to the JMF [Psychological

Services Unit]"); *id.* at 585 (stating that "a very significant percentage of prisoners at [JMF] (which

is largely housed with ill inmates due to its proximity to Duane Waters Hospital) experience

significant mental illness on a regular basis and would benefit from regular treatment"). Coupled

with the State's stated willingness to cure several of the other alleged deficiencies identified by the

district court, these developments may facilitate the parties' ability to reach agreement on the mental

health services needed in the remaining *Hadix* facilities and could affect the ongoing scope of the

district court's November 13 order. If indeed the State closes JMF, for example, some portions of

the district court's November 13 order assuredly will have little relevance—such as the requirement that the State's mental health care plan "must include additional staffing to ensure full-time psychiatric coverage at JMF." *Id*. at 597.

If the parties agree—or even partially agree—about the necessary mental health services and the appropriate use of restraints in the remaining *Hadix* facilities, or if some of the district court's initial orders become irrelevant, rulings by us on the constitutional and other questions arising from the district court's November 13 decision could become unnecessary or, at a minimum, could concern a dispute of a different magnitude from the one we face today. We therefore also remand this order to the district court—a course we believe is particularly prudent here given that "strong considerations of comity . . . require giving the States the first opportunity to correct the errors made in the internal administration of their prisons." *Lewis v. Casey*, 518 U.S. 343, 362 (1996) (internal quotation marks omitted). To the extent the parties cannot agree on the steps necessary to cure the alleged mental health care deficiencies, the district court has the authority to order those remedies it believes are appropriate—or leave in place all or some of its current orders—and the parties remain free to appeal any such order or decision.

2.

Recent events also impact the State's appeal of the district court's December 7 decision establishing the Office of Independent Medical Monitor. For one, the closure of JMF likely will diminish the Medical Monitor's role given that it will have far fewer *Hadix* prisoners to monitor after

the closing of that facility—a closure, says the State, that will occur within 45 days of the effective date of the district court's order accepting its August transfer plan. For another, the removal of SMT Building B (and possibly Building A) from the reach of the consent decree will diminish the role (and expense) of the Medical Monitor as well. For yet another, the district court's recent decision approving the State's August transfer plan implicitly calls into question some of the responsibilities and powers that the court previously gave to the Medical Monitor. For instance, in its March 6 decision, the court gave the Medical Monitor authority to review complaints from prisoners who allege that they are not receiving appropriate medical care in the non-*Hadix* facility to which they have been transferred and, if necessary, to order the State to return those prisoners to the *Hadix* facility. *Hadix*, 2007 WL 710136, at *10. Yet, in its most recent decision, the district court suggested that giving the Medical Monitor such power would exceed the scope of the consent decree. *See Hadix*, Opinion at 14 (indicating that, "[i]f . . . actual conditions in a new facility violate the Constitution, a proper plaintiff can . . . bring new litigation"). We find it difficult to reconcile those two decisions and believe it more prudent to give the district court an opportunity to address the point and to consider whether recent developments make it necessary for the court to alter the Medical Monitor's authority and mandate. We therefore remand this order to the district court as well.

3.

Recent events also affect the State's appeal of the district court's April 3 decision addressing heat-related issues in the *Hadix* facilities. One of the State's principal objections to the district court's April 3 decision is that, in light of the court's March 6 decision interrupting the closure of JMF, the State might have to install air conditioning in JMF even though it hopes and plans to close that facility in the very near future—that is, the State might have to pay significant capital expenditures that will have only a modest short-term benefit. Given the district court's recent approval of the State's transfer plan, however, and given the State's current assumption that it will be able to close JMF before next spring or summer—when the heat index may approach 90 again—the State's concern seems far less material. The State, as a result, may well be more inclined voluntarily to take steps at the remaining *Hadix* facilities, which the State plans to keep open for the foreseeable future, to satisfy the plaintiffs' heat-related concerns. If so, the need for us to rule on several of the difficult questions—including constitutional questions— raised in the State's appeal may disappear.

What is more, if the State is able to close JMF in the near future and if the district court declares that SMT Building A is no longer a "*de facto Hadix*" facility, the number of prisoners at risk for heat-related injury in the *Hadix* facilities (other than Duane Waters Hospital, which has air conditioning) will decrease significantly. *See Hadix*, 492 F. Supp. 2d at 746 (indicating that, as of September 2006, 523 JMF inmates and 634 Parnall (or SMT) inmates were "classified as having

heat-related illnesses"). Most of the remaining prisoners in the *Hadix* facilities will be housed in RGC—a facility in which the average-prisoner stay, according to the State, is only 25 days and in which the number of prisoners with heat-related illnesses is quite low relative to JMF and SMT. *See id.* (indicating that, as of September 2006, 207 Egeler (or RGC) prisoners were classified as having heat-related illnesses); *see also id.* at 745 (explaining that one of the important factors in assessing an individual's risk of heat-related illness is "the length of exposure to extreme heat conditions"). Rather than speculate about how these potential changes in the *Hadix* facilities' prisoner population could affect the district court's previous orders concerning heat-related injury, we believe the more prudent course is to give the district court the opportunity to evaluate the issue in the first instance. Accordingly, we also remand this case.

C.

In closing, we wish to emphasize that, if the parties fail to resolve the remaining issues between themselves and if any party remains dissatisfied with any prior or future order of the district court, we stand ready to hear their concerns—including hearing their appeal on an expedited basis, if appropriate. In view of the budgetary concerns underlying the State's position in these cases and in view of the importance to the plaintiffs of resolving these issues sooner rather than later, we urge the parties and the district court to focus on, if not eliminate, the remaining areas of disagreement in the near term so that any renewed appeal or new appeal to this court may be heard by this panel no later than the spring of 2008.

III.

For these reasons, we remand all six cases to the district court.